And call our last case of today, No.17-1491, Lazar v. Supt.Fayette SCI, Mr. Epstein and Mr. Goldsboro. May it please the court, my name is Jules Epstein, I apologize for the frog in my throat, it's this seasonal affect. I represent Stephen Lazar, with your permission I have requested to reserve two minutes. That's fine. Thank you. If the court please, this is a case where several facts are beyond dispute. Fact one, Mr. Lazar was a methadone user at a very high dosage. Fact two, his last methadone dispersal or getting treatment of methadone occurred approximately 22 hours before his arrest, which meant that his interrogation, which had statements at the 33 hour and the 50 hour point subsequent to his receiving his last dose, would be at a point where normally the body is going through withdrawal. Fact three, withdrawal can be quite painful. You can also make truthful statements during withdrawal and I understand an expert testifier to that. I'm not disputing that, if I may judge for one case, one can but a jury to decide whether it's truthful is entitled to the information of what condition one was in. And that goes to fact four, again beyond capital. And that is that it was because of trial counsel's error that the jury was misinformed and told his last dose was a month before. I'm going to suggest to you that there is a fact five that is beyond dispute and that makes clear his entitlement to relief. The two police statements that are at the core of this case are the core, if not sole proof of robbery. In other words, there are statements that he's alleged to have made to a series of his drug-using friends that I killed somebody. A jury acquitted him of intentional murder. To convict him of felony murder, there had to be an actus, either as a direct participant or an accomplice, and a felony. The proof of the felony comes from the police statements. We are here to ask this court to determine the following. Let me ask you, he had actually made statements, not just to the police, but he had made statements to other individuals. Five people, if I remember correctly, testified to statements that Lazare made implicating himself at the scene of the homicide. Yes, but not as to the felony component, your honor. To be convicted of felony murder in Pennsylvania, there must be proof of a felony. It's during the commission of, and we have absent the police statements, his statements to his friends, and I can talk later about why they're not overwhelming evidence, or I killed a guy, I used a hatchet, things to that effect. Sam's mention of a felony. When you put everything together, the five statements, and then his own statement, although I understand he had taken methadone about 24 hours before he made his statement. Respectfully. If you put all that together, why couldn't the jury come to, I mean, you're asking us to tell the jury you got it all wrong. You found facts, but they don't make sense. Just the opposite, respectfully. First, a factual correction, if I may, Judge Fuentes. Sure. The 24 hours is the gap between his last methadone and his arrest. 10.30 on the 18th, the morning of the 18th, he gets methadone. You get methadone on a daily basis, because after 24 hours, withdrawal starts to kick in. His first statement was 7.30 the next night, so now we're well into the 30 plus hours range. His final statement, which is what the Commonwealth principally relies on to convict, is at the 50 hour stage, but we're not asking the court to say to the court to say that Mr. Lazar was entitled to have a jury weigh whether the fact that he was no longer getting this necessary medication raised an issue of the reliability of that statement. What do you make of the District Court standard review, Mr. Epstein? I'm sorry? The District Court standard review here, did the District Court get it right? I respectfully say no. I realize the Commonwealth says the District Court got it wrong in the first place. I don't think there should have been a COA. Our position is that the District Court got it wrong that there were grounds for de novo review, and there are two such grounds. Ground one... Well, I had the same thought as Judge Restrepo, but if that's true, what's the remedy? If he got it wrong because he got the standard of review wrong, then this court would say, to Judge Fuentes, that indeed... Maybe he shouldn't have granted the certificate of appealability. No, I'm suggesting that the way he got it wrong is a way that this court can remedy because he got it wrong in the fact that Mr. Lazar was entitled to de novo review. If you... I need to back up for one second. That's not a basis for issuing a certificate of appealability. I may have misheard Judge Restrepo's question because I think there are actually two questions here. One is, the Commonwealth argues that Judge McHugh got this wrong and we shouldn't even be here. Regardless of that position, what standard of review should the District Court have taken to the merits? My argument is, and the law is, that Mr. Lazar was entitled to de novo review for two discreet reasons. In other words, not a pedefrance. Reason number one, the state courts weighed prejudice. Remember, the state courts found deficient performance. No prejudice. No prejudice, overwhelming evidence. When you read the trial judge, who was also the PCRA judge, Judge Tafin and Ms. Stasi's And when you read the Superior Court opinion, they simply treat as only impeached the five lay witnesses, and they ignore the fact that none of those witnesses' statements make out robbery. There are also other aspects of the defense case that they ignored. Like it or not, when weighing prejudice, you have to take the good and the bad, and they only took the bad. The second reason is, in the state courts, we argued from day one that the methadone information was pertinent to two discreet claims. One, the jury determination of voluntariness. But two, and this goes back to Judge Fuentes' comment at the beginning, reliability. Why is there substantial evidence that methadone withdrawal could have changed the outcome of the trial here, given that experts said that he was taking other medications that could suppress the delay symptoms of withdrawal? Because the expert nonetheless opined, and we quote this in our brief, that he would have been in withdrawal, and it would have impaired his volition and his ability to make rational decisions. But the hospital records show that the medications that he was being given were a low-dose withdrawal medication. I understand that. But what we're getting to now is, Judge Amber, we have competing experts. I can only say the expert we retained, Dr. Woody, is a world-renowned expert on methadone and its withdrawal, and the impact of withdrawal, I should say. And he opined that this would have affected, or certainly could have. The point is that there was... Affected what? Affected the ability to make a rational decision. Affected the ability to withstand the pressures of interrogation. So does that go to the reliability of the confession? Affected the ability to give a reliable statement. And again, this comes back to that it's the police-obtained statement or statements that establish the felony component here. You think the statements that he made to the other individuals who testified in the case amount to nothing? No, sir, I did not say that. Let's say have no bearing on whether he in fact committed the homicide or not. I don't say they have no bearing. Neither of those questions respectfully is an apt question when you're looking at prejudice. Yes, there are statements. On the other hand, they are statements that don't address that felony component. So assume they make him guilty of some involvement. He was convicted of felony murder. They don't do the job. You don't think a jury could, based on instructions of the court and based on the arguments presented by counsel, could make rational inferences from the evidence that is presented to them? Respectfully, the Commonwealth in its closing argument used explicitly the statement to the police to say, and that's what made this felony murder. The statements to the other people don't. If I may, I put all the tags in that one basket. On the felony component, yes. Again, Judge Fuentes, if one goes to the closing argument of the Commonwealth, out of approximately 36 pages, 11 are devoted exclusively to the police statement. And it's while discussing that, and I can pull the page if the court needs it, that the Commonwealth says, and listen to that statement, that's what gets you felony murder. The Commonwealth was going for more, but they did that. And the Commonwealth also acknowledged that these statements to the friends were statements made when people are getting high together. But again, I'm trying to distinguish because, yes. I think it was the government expert and the defense expert both said that a person of their methadone can still make truthful statements. Can, but not necessarily does. Isn't that an argument for counsel to make? Counsel was prohibited from making that because counsel never got the right methadone records. We had, but didn't know. I should correct that. Counsel had a stack of about 500 pages. Within, he had a medication dispersal chart, which ended in October. In that bigger stack were papers showing that it continued beyond. It took him five minutes walking to the methadone center to get the complete records. Judge McKee was clearly troubled by this confession. Right. Isn't he bound, aren't we all bound by this, the Colorado versus Connolly, the Supreme Court case with respect to, go ahead. I'm sorry. I apologize. The unreliability is not a basis to suppress the statement. I'm not asking for suppression. Please hear, I am not challenging the trial court's decision to suppress, to not suppress the statement. This goes solely to a jury, and it's included in the jury instructions in this case. We're told to decide two things. Was this confession voluntary, if not disregarded? If it was voluntary, make a separate determination, was it reliable? Not was it reliable for suppression issue, but as a fact-finding, was it reliable? Can you take it to the bank? And because the jury, go ahead. I thought, did they make that decision? They made that decision without the information that he had been on methadone up until 24 hours before, and without the benefit of an expert. Trial counsel had hired an expert, but the expert said, with the records you gave me, because trial counsel only looked at that top layer, couldn't go forward. So it's not that the jury didn't get a chance legally. It's the jury didn't get a chance because they were never given the data. But then Judge DeFito, in essence, made the same analysis and came to the conclusion there was, ineffective, there's been no prejudice. She did, and we suggest that that's wrong because she did not weigh the impeachment material, the fact of an alternative suspect, and most critically, that this statement went to the robbery. I see that my time is up. Thank you very much. We'll be back with a rebuttal. Mr. Goldsboro. Good afternoon, Your Honors. Your Honors, may it please the Court, I'm John Goldsboro from the Philadelphia DA's Office, representing the appellees. Your Honors, initially I'd just like to thank the Court for rescheduling the oral argument here to allow us an opportunity to reevaluate, and I'd like to thank esteemed opposing counsel for not opposing that request. Your Honors, I'd like to make it clear that through no fault of the Commonwealth, it was wrong and a mistake that both sides stipulated a trial, that the last dose of methadone was in October, in this case. But the district court was right and did act reasonably after a full hearing. The district court of the trial court? I apologize. The PCRA court is right after a full hearing, and the district court was right to find reasonable what the PCRA court found, which is that there was no prejudice applying the inherently hypothetical Strickland standard. And I'd just like to read a little bit from the PCRA court's finding on that. It's from the notice of testimony of July 15, 2013, at page 15, stating not only that this court does not find that there would be a reasonable probability that the outcome of the trial would have been different had the jury received this information. At best, they would have heard from competing experts, in other words, taking the bad with the good, that the defendant was experiencing an unknown quantum of withdrawal symptoms during the taking of his statements. This evidence, the court finds, would have little weight up against the hospital records, as Judge Angro, you've referred to, which provided direct observations by trained medical experts. And I might add that was five to six hours after the last statement was signed. Even if one could find that the jury could have found the statements to be involuntary, based on the additional information which would have been presented had counsel not performed unreasonably, there is still, in this case, overwhelming evidence of guilt as provided by the defendant himself in making statements regarding his involvement in the murders to numerous witnesses who testified at the trial. So I think the court, as the Superior Court found, did look at all of the other evidence, the totality, and didn't need to enumerate every single thing it was considering when it was considering the hypothetical analysis in Strickland whether there would be a reasonable probability that the result would have differed had this evidence been presented. But it's not just the evidence. Is it the case that that last statement to the police is probably the most important in this case, as far as the prosecution is concerned? I would say it's... That's where there was a direct complicity. I'm sorry, direct? That's the one where he apparently made clear that there was direct complicity in the murder? Yes, that he participated in it by striking the victim as well as by getting the proceeds of the robbery. And that's the argument where he directly admits that. But there is other evidence of robbery. But what if he didn't have that? If he didn't have that... Supposing that were taken out, would you have it? You wouldn't have felony murder, would you? Well, I think we would still because... And I think the trial court, as I said in that, would still... has already said that it wouldn't have changed the result. And that is because if that statement had been found involuntary and would have been out of the case, you'd still have the statement of the 19th where he agrees to participate in robbery with this friend, imaginary or not, John from Puerto Rico, who has never been found. But he agrees to that and then he goes... John takes his suitcase and he admits in that statement of the 19th that his suitcase was left in the property during this murder and that he saw. He came upon John later and he saw a body on the floor. He saw the blood he'd seen. He saw John rifling through the drawers looking for silver, looking for things to take. And then when he's asked, well, did you get any of the proceeds of the robbery? He denies it. He said, no, I just ran away immediately. But I think circumstantial evidence shows the victim's wallet was missing. The victim's keys were missing. The drawers had been rifled through. There was a gold chain on the floor. The victim's daughter testified that his keys and wallet were not there. So I think you have circumstantial evidence of a robbery and I think you have a defendant agreeing to participate in a robbery with this other fellow. So I think that's the basis of the PCRA court's finding. And, again, she was the trial judge. She saw all of the testimony during trial, motion to suppress trial, and PCRA. And I think this was the basis for her finding, that even had the jury found that last statement to have been involuntary, there would still not have been an effect on the verdict. He had made prior statements to several people that testified, I understand, but he never said he killed anybody, did he? Oh, in the other statements to his friends, he did. He did. Not only to the five who testified, but to three others. So if he took out the statement to the police, then you still have enough statements to other individuals that he was not only there, but participated in a homicide? That's correct. And they interlock. And the way it came to light was not the police focusing immediately on Mr. Lazar, his roomie, and he had what the police termed a domestic dispute. And they came to find his roommate fighting, and since Lazar was on the lease, they took Russell Angeli and said, well, you have to leave now, you can't stay here, so let's take you to somewhere else. Apparently they were going to book him for fighting for assault. And he said, I have some information that's been on my mind that's been bothering me because Mr. Lazar has confessed to me this murder and shown me this suitcase and told me that he really did do it. And then several days later, I believe that was on November 2nd, then Saron Wilson, another methadone clinic friend of both Lazar and Angeli, came forward to the police on his own. He was a friend of Angeli, and apparently Angeli had said something to him about going to police because he was concerned. Saron Wilson said to the police, I've been telling Russell Angeli to leave that situation where he's sharing a room with Lazar because Lazar's getting worse, he has knives all the time, and he's confessed to both of us that he committed murder. Angeli said that Lazar told him about it in July, right after Lazar returned from the police, and then a month later in August. And Saron Wilson said that Lazar told him about it in October. None of those statements implicated felony murder, correct? That's correct. That's Mr. Rebsen's point. The only statement that implicated felony murder was the one at issue. The very last one talks about, it admits robbery, that's the November 20th one, but the November 19th one, which is far less likely to have been affected by any of the slowly progressing methadone symptoms, according to both experts. That one admits that he agreed to commit robbery, and then came upon his friend with whom he agreed to do it, a dead body of his feet and blood all over the place and looking for valuables. So it's close. It's close. It's, I think, enough, as the trial court found, as the PCRA court found. What do you think of his comment on the statement of standard of review, that viewing this as de novo review? Yes, I don't understand that, because there was a full PCRA evidentiary hearing on this one claim. There was one claim in his habeas petition. It's the ineffectiveness of counsel for failing to get these methadone, to present these records, and that's the claim that the PCRA court held a hearing on, and I don't understand how EDPA review could not possibly apply to that when the state court not only held a hearing, it adjudicated on the merits of denying it after a very, very careful search and inquiry. I mean, the PCRA judge was asking questions from the bench here of both experts and of the police officers who testified, and probably, as long as we're talking about the experts, the progression of symptoms, I think, is particularly important here, because both experts talked about, as you pointed out, Judge Fuentes, the fact that he was taking other medications at the time, both by self-report and by what was in his urine, and the jury, by the way, heard in stipulation what was in his urine in those hospital records from five or six hours after the last statement, that those medications not only lessen the severity of withdrawal symptoms, but they slow down the progression, and the progression starts with simply subjective, they both agreed on this, simply subjective things, just like feeling like you have a cold, aches and pains, and then they start to become objective, but the objective symptoms when they start in this progression are ambiguous. They start with things like sniffling, and so the police might have thought, well, he has a cold, and then runny eyes, just tearing a little bit more than usual, and then aches and pains become more severe, and then there becomes nausea, and he did complain of nausea six hours after the last statement was signed, when he was at the hospital, but they only gave him, according to the hospital records and the expert testimony of the PCRI jury, a little bit of Compazine, one small dose, and normally it would be three or four per day. They didn't give him any to take with him, and they gave him such a small dose of Clonidine, which is the same as Caprase, that, according to the experts, that dose would not be used for withdrawal symptoms. That is a dose to be used for high blood pressure, and that's exactly what they diagnosed him with at the hospital. He was not diagnosed with withdrawal symptoms. He was diagnosed with depression, suicidality, I'm in trouble with the police, drugs are ruining my life, he told the hospital workers, and hypertension, and they gave him a little bit of a high blood pressure medication and a little bit of nausea medication and let him go within 20 minutes, and that is not the sort of treatment that they would have given somebody showing extreme withdrawal, according to the experts credited by the PCRI judge. What standards should a district court have used or used in deciding whether to grant a certificate of appealability? Your Honor, I don't think that's necessarily our strongest point in the brief, and I would just like to make clear that we're no longer pursuing the objection to the certificate of appealability. Thank you. One more question. Yeah. If the court has no further questions. No, nothing further. Thank you. Thank you, Your Honor. Thank you. Mr. Epstein. Thank you. Five points, please. We agree this was no fault of the Commonwealth. This was entirely the fault of deficient counsel, not getting records and not knowing what to do. Second point, my colleague keeps talking about involuntary. We are focused on reliability. The United States Supreme Court has made that distinction clear since 1964. Judge McHugh discusses that in his opinion. Third, respectfully, if one reads the 19th statement, which is at that 730 in the evening, 30-some hours, two points, withdrawal is already going on. It may not be visible to those watching. That's what they meant by objective. But it is already going on, and it dances around the issue of robbery. Staying with that, Judge Fuentes, as you asked about the expert and what he said, respectfully, the answer is at supplemental appendix page 95, when the defense expert, Dr. Woody, said at the PCRA hearing, sometimes people will say I will do anything to get out of this situation. If this would get me out of it, I will get out of it. They can feel pretty desperate when they're having withdrawal. That is what I meant. That was the expert explaining why he, as a well-regarded expert in this field, said in his opinion this statement was neither voluntary nor reliable. Last issue about AEDPA. This is not what claim we raised. Yes, we raised an ineffectiveness claim. But in that, the ineffectiveness error was in the state court not looking at the whole record when it decides prejudice. It only looked at the evidence in the light most favorable to the commonwealth. And that entitles this court to do dang over review because that's either contrary to or unreasonable. May I finish my sentence? You're sure you're okay. Thank you. You're welcome. And the second one, again, is within that rubric, when we argued ineffectiveness in the state court, we said the jury was entitled to hear this evidence, not just on voluntariness, but on reliability. But both Judge DeFino-Nastassi and the Superior Court only addressed voluntariness. So that claim has been raised all along when it's never addressed by the state court. This court, or the district court, is entitled to and must review it de novo. I know it's the end of the day. Thank you for your courtesy. No problem. Very well-argued case by both counsel. And we'll take a minute of your advisement. Thank you for being with us today. Thank you. Thank you.